UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEANNA BREDBENNER, PAUL GILBERT, and BELINDA SERRANO, both individually and on behalf of all other similarly situated persons, | Civil Action No. 09-905 (MF) |
| Plaintiffs, | |
| v. | |
| LIBERTY TRAVEL, INC., | |
| Defendant. | |
| CAROL CONNELL, WILLIAM KRUMPHOLZ, CORRINE ORCHIN, NICOLE REID, and LEIGH ANNE HUBBS, both individually and on behalf of all other similarly situated persons | Civil Action No. 09-1248 (MF) Civil Action No. 09-4587 (MF) |
| Plaintiffs, | **OPINION** |
| v. | |
| LIBERTY TRAVEL, INC., FLIGHT CENTRE USA, INC., GILBERT HAROCHE, and MICHELLE KASSNER, | |
| Defendants. | |

**FALK, U.S.M.J.**

This case and the companion actions described below arise from a series of complaints initiated against Liberty Travel, Inc. by former employees for unpaid overtime. On July 9, 2010, the parties reached a global settlement in principle. The Court provisionally certified a settlement class and granted preliminarily approval of the class action settlement on November 19, 2010. CM/ECF No. 97. Presently before the Court are three related motions seeking (a) final

certification of the settlement class; (b) final approval of the class action settlement; (c) approval of the collective action settlement; (d) attorneys' fees and costs; and (e) service payments for named Plaintiffs. CM/ ECF Nos. 98, 102, 105. A fairness hearing was held on March 14, 2011. CM/ECF No. 113. For the reasons set forth below, Plaintiffs' motions are **granted** in their entirety.

## I.  BACKGROUND

Defendant Liberty Travel, Inc. ("Liberty") operates a network of retail stores throughout the country that offer travel services (Answer ¶¶ 2, 29). The company employs travel agents to service its customers (Id. ¶ 2). Travel agents as part of their job description are required to work in excess of forty (40) hours as the position may demand (Pls.' Brief in Supp. of Mot. to Certify a FLSA Action Attach. 3, Ex. 3 ("Employment Agmt.") ¶ 2.2 [CM/ECF No. 15]; see also Decl. of Michael J.D. Sweeney in Supp. of Pls.' Renewed Mot. for Expansion of the FLSA Collective Action Class ("Aug. 28, 2009, Sweeney Decl.") Ex. D, at 25 ("There will be times when you will need to work overtime . . . .") [CM/ECF No. 53]). Plaintiffs are generally a group of former Liberty employees that worked as travel agents in the Northeastern United States.

### A.  Compensation Scheme for Liberty Travel Agents

Travel agents working for Liberty are compensated through a mix of weekly base pay, commissions, bonuses, and overtime for hours worked in excess of forty (40) per week (Employment Agmt. ¶¶ 3.1-3.4; Aug. 28, 2009, Sweeney Decl. Ex. A ("Joint Stip."), at 1). Overtime pay specifically is calculated using a formula that is appended to Liberty's form employment agreement as Exhibit A (Employment Agmt. ¶ 3.2; Joint Stip. 1). Employees eligible for overtime receive one-half (1/2) their effective hourly rate, derived from a composite of their weekly base pay and the total number of hours worked that week, for each overtime hour

(Employment Agmt. Ex. A; Joint Stip. 1). The employment contract also specifies that their compensation scheme would "convert" to a fixed hourly rate once the employee exhausts all previously allocated personal time for each hour that they work under forty (40) in any given week (Employment Agmt. ¶ 3.3; Joint Stip. 1). Liberty apparently changed to a different payment model at some point in September 2008 (Pls.' Brief in Supp. of Mot. to Certify a FLSA Action Attach. 3 ("Fiorenzo Decl.") ¶ 12 [CM/ECF No. 15]).

### B.  Summary of Claims

Plaintiffs in these matters maintain that the formula used by Liberty to calculate overtime establishes a "diminishing" pay structure (Compl. ¶ 2). Because the overtime rate of pay is not fixed and instead dependent on the sum total of hours accumulated each week, they argue that overtime pay progressively decreases as the number of hours spent working overtime increases (Id.). Liberty contends that it properly paid overtime under applicable law by using the widely-accepted "fluctuating work week" ("FWW") method to determine the amount of overtime due to each employee (Def.'s Brief in Opp. to Pls.' Mot. to Certify FLSA Representative Action and to Issue Notice 11-13). See 29 C.F.R. § 778.114 (Department of Labor interpretive rule codifying Supreme Court jurisprudence on the FWW approach to overtime); see also Urnikis-Negro v. Am. Family Prop. Serv., 616 F.3d 665, 673 (7th Cir. 2010) (discussing background and construction of § 778.114); Hunter v. Sprint Corp., 453 F. Supp. 2d 44, 55 (D.D.C. 2006) (same).

### C.  Procedural History

Plaintiffs initially brought suit against Liberty and its parent company, Flight Centre USA, Inc., in the U.S. District Court for the Southern District of New York under the caption Reid v. Liberty Travel, Inc. on November 17, 2008. That action was dismissed without prejudice to re-filing in the District of New Jersey for improper venue on February 20, 2009 (Decl. of

3

Michael J.D. Sweeney in Sup. of Pls.' Mot. for Final Certification of the Settlement Class ("March 4, 2011, Sweeney Decl.") ¶ 1 [CM/ECF No. 100]).

On February 27, 2009, Deanna Bredbenner, Paul Gilbert and Belinda Serrano filed this putative collective action against Liberty Travel, Inc. under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (2006), for unpaid overtime. CM/ECF No. 1. On March 19, 2009, Carol Connell, William Krumpholz, Corrine Orchin, and Nicole Reid, filed a class action on behalf of a putative class comprised of Maryland, Massachusetts, and New York residents, against Liberty, Flight Centre, and two high-ranking Liberty executives, Gilbert Haroche and Michelle Kassner, under state labor law for similar reasons. Docket No. 09-1248, CM/ECF No. 1.[1] The Connell complaint was amended to include a cause of action under 29 U.S.C. § 216(b) for violation of the overtime provisions of the FLSA. Docket No. 09-1248, CM/ECF No. 4. On September 4, 2009, Leigh Anne Hubbs filed suit against Liberty Travel, Inc., Flight Centre, Gilbert Haroche, and Michelle Kassner, under the FLSA and New Jersey wage and hour law, individually and on behalf of all others similarly situated. Docket No. 09-4587, CM/ECF No. 1.

Because many of the issues involved in the Connell case were similar to those raised in Bredbenner, the Connell action was stayed pending resolution of the legal issues in Bredbenner (Sept. 2 Order, at 3 [Docket No. 09-1248, CM/ECF No. 31]). The Court ordered that "the final determination of those issues in Bredbenner will apply with equal force and effect to the FLSA claims in [Connell]" (Sept. 2 Order, at 3). For similar reasons, the Hubbs case was consolidated

---

[1]  All references to docket entries standing alone relate to submissions made in the lead Bredbenner case, and all references to docket entries preceded by a case number relate to submissions made in the case assigned to that case number. For example, the above-noted reference indicates entry number one (1) on the Connell docket, which is assigned case number 09-1248.

and stayed with <u>Connell</u>. Docket No. 09-1248, CM/ECF No. 43.[2]

Only July 31, 2009, the Honorable William J. Martini conditionally certified the FLSA claim in <u>Bredbenner</u> as a collective action for all persons employed by Liberty as a travel agent in Delaware, Maryland, and New York, between August 13, 2006, and September 1, 2008. <u>See</u> <u>Bredbenner v. Liberty Travel, Inc.</u>, No. 09-905, 2009 WL 2391279 (D.N.J. July 31, 2009); <u>see also</u> <u>White v. Rick Bus Co.</u>, 743 F. Supp. 2d 380 (D.N.J. 2010) (describing two-tiered approach to class certification of FLSA claims). In all, one hundred and forty-three (143) individuals eventually opted-in to the <u>Bredbenner</u> action, nine (9) opted-in to the <u>Connell</u> action, and two (2) opted-in to the <u>Hubbs</u> action (March 4, 2011, Sweeney Decl. ¶¶ 6, 14, 16).

### D.  Joint Statement of Facts and Discovery

Prior to entering settlement negotiations, the parties had conducted an extensive investigation into the underlying claims. The parties represent that they recognized that liability could likely be resolved on summary judgment and both sides were amenable to stipulating to certain core facts (March 4, 2011 Sweeney Decl. ¶ 9). Beginning in July 2009, they worked together on crafting a joint statement of facts pursuant to Local Civil Rule 56.1 (<u>Id.</u>). Discovery proceeded on disputed matters.

As part of discovery, Plaintiffs' counsel received and analyzed a large amount of electronic discovery (<u>Id.</u> ¶ 19). In January 2010, Defendant deposed each of the named parties, and Plaintiffs held a 30(b)(6) deposition of Defendant (<u>Id.</u> ¶ 10). Plaintiffs also noticed other depositions as well, (<u>Id.</u> ¶ 11), and filed a motion to compel further discovery, CM/ECF No. 90.

---

[2]  The <u>Hubbs</u> case, which at that point was consolidated with <u>Connell</u> ("<u>Hubbs/Connell</u>"), was subsequently consolidated with <u>Bredbenner</u>, CM/ECF No. 82, but the Court later unconsolidated the <u>Hubbs/Connell</u> matter from <u>Bredbenner</u> and re-stayed the <u>Hubbs/Connell</u> action. CM/ECF No. 84. Thus, the cases were on the same procedural posture as they were before <u>Hubbs</u> was consolidated with <u>Bredbenner</u>.

Plaintiffs also informally interviewed several putative class members and opt-in plaintiffs to gather additional information (March 4, 2011 Sweeney Decl. ¶ 19). The parties also had the benefit of previously-obtained discovery from a distinct lawsuit against Liberty that involved twenty-nine (29) depositions, dispositive motion practice, and trial decisions (Id. ¶ 19).

### E.  Settlement Negotiations

The Court held in-person settlement conferences on five separate occasions since February of 2010. See CM/ECF Nos. 80, 83, 86-88. After nearly six months of negotiations, and numerous settlement conferences, the parties reached a global settlement in principle on July 9, 2010, that resolves all claims in each of the pending overtime suits (March 4, 2011 Sweeney Decl. ¶ 21). The Court oversaw the negotiation process (Id. ¶ 62). The salient terms of the settlement were memorialized on the record on July 9, 2010. See CM/ ECF No. 94.

### F.  Terms of Settlement

The settlement agreement creates a common fund of $ 3,000,000 for: (1) settlement payments as consideration for the release of all class claims; (2) attorneys' fees for class counsel; (3) enhancements or "service payments" for class representatives; (4) payroll taxes associated with the settlement; and (5) claims administration expenses (Pls.' Mot. for Prelim. Approval of Class Settlement and Other Relief Ex. A ("Settlement Agmt.") § III.B.1 [CM/ECF No. 96]). It contemplates the prospective certification of a state law settlement class (Id. § II.OO). Workers eligible to receive a payout under the settlement include all named plaintiffs, all state law class members who do not affirmatively opt-out, and all class members who affirmatively opted-in to one of the FLSA actions (Id. § II.OO (cross-referencing § II.N)).

The common fund will be distributed in the first instance to qualifying class members, less their pro-rata share of attorneys' fees, and to satisfy any "service payments" approved by the

Court (Id. § III.B.1.f-e). All class members who timely file a valid claim will receive one and a half (1.5) times their hourly rate, based on a forty (40) hour work week, for each overtime hour they worked during the class period less overtime already paid to them by Liberty (Id. § II.S). All original opt-in plaintiffs will also receive a premium equal to twenty-five percent (25%) of their total overtime claim (Id. § II.S). The minimum payout is $50 (Id. § II.S). Fifty percent (50%) of the total payment will constitute wages, subject to income taxation, and the other fifty percent (50%) will constitute liquidated damages (Id. § III.B.1.c). The remaining money will be used to satisfy claims administration expenses and payroll taxes associated with the settlement payout (Id. § III.B.1.g). Finally, Liberty will retain any unused funds (Id. § III.B.1.g).

### G. Preliminary Approval and Notice

On November 19, 2010, the Court provisionally certified for purposes of settling the state law claims only, see In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods Liability Litig., 55 F.3d 768, 792 (3d Cir.), cert. denied, 516 U.S. 824 (1995) (discussing and approving use of settlement-only classes), a class consisting of all individuals who worked as full-time Liberty travel agents:

(1)    in Maryland between March 19, 2006, and August 31, 2008;
(2)    in Massachusetts between March 19, 2007, and August 31, 2008;
(3)    in New Jersey between September 4, 2007, and August 31, 2008; and
(4)    in New York between March 19, 2003, and August 31, 2008

(Nov. 19 Order ¶ 31 [CM/ECF No. 97]). The Court also appointed Getman & Sweeney, PLLC as class counsel, preliminarily approved the class action settlement of state claims as fair, and approved the notice and claim forms used to apprise potential class members about the lawsuit and fairness hearing (Id. ¶¶ 21, 38, 41).

Following preliminary approval of the settlement class and the proposed settlement agreement, Liberty provided a list of possible class members to the claims administrator

(Declaration of Bernella Lenhart in Supp. of Mot. for Final Approval of Class Action Settlement ("Lenhart Decl.") ¶ 2 [CM/ECF No. 101]). A notice package was mailed out on December 3, 2010 (Id. ¶ 3). The notice contained information on the underlying claims in each case, the terms of the settlement, the period of time within which to file objections, the ability to opt-out, and the date of the fairness hearing (Id. Ex. A "Settlement Notice")). Out of the one thousand two hundred and eighty-three (1,283) members that were mailed a package, five hundred and thirty two (536) returned a claim form to the claim administrator (Lenhart Decl. ¶¶ 2, 9).[3] Only six class members chose to opt-out of the settlement (Id. ¶ 10). The claims administrator received no objections whatsoever (Id. ¶ 11). The Court held a fairness hearing on Monday, March 14, 2011. See CM/ECF No. 113.

## II.  DISCUSSION

### A.  Certification of Settlement Class

In order to obtain class certification, a party must show that all four prerequisites of Rule 23(a) are met and that the case qualifies as at least one of the matters identified in Rule 23(b). See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994) (citing Wetzel v. Liberty Mut. Ins. Co., 508 F.3d 239 (3d Cir.), cert. denied, 421 U.S. 1011 (1975)). Class certification calls for a "rigorous analysis" of the factual and legal allegations. See Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006) (quoting Gen. Tele. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)); 5 James Wm. Moore et al., Moore's Federal Practice § 23.61[1] (3d ed. 2008). The Court therefore may conduct a "preliminary inquiry" into the merits before it determines that the

---

[3]  Of the returned forms, four (4) were postmarked after the deadline to file a valid claim and seven (7) contained various deficiencies (Lenhart Decl. ¶¶ 2, 9). The parties advised the Court that they would still treat the four (4) late filings as eligible under the settlement (Transcript of Mar. 14, 2011 Fairness Hearing ("Tr."), at 28:10-19 [CM/ECF No. 113]). In addition, the Court ordered that all members who filed an inadequate claim form should be provided (10) additional days to cure any deficiencies in their previously filed form (Tr., at 28:5).

requirements for class certification are satisfied. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316-17 (3d Cir. 2008) (citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 168 (3d Cir. 2001)).

A party that seeks to certify a settlement class must satisfy the same requirements necessary to maintain a litigation class. In re Gen. Motors Corp., 55 F.3d at 778. The substantive terms of the settlement agreement may factor into certain aspects of the certification calculus. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997).

Plaintiffs move under Rule 23(b)(3). The Court preliminarily found that the requirements of Rules 23(a) and 23(b)(3) were met. The Court now finds that all the requirements for class certifications are in fact satisfied.

### i.  Rule 23(a) of the Federal Rules of Civil Procedure

A case may be certified as a class action under Rule 23 only when:

(1)     the class is so numerous that joinder of all members is impracticable;
(2)     there are questions of law or fact common to the class;
(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); Weiss v. York Hosp., 745 F.2d 786, 807 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985). These four threshold requirements are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy of representation," respectively. See, e.g., In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004).

### a. Numerosity

Rule 23(a)(1) requires that the size of the class is so large that joinder of all potential parties is impracticable. Impracticability does not mean impossibility. Dewey v. Volkswagen of Am., 728 F. Supp. 2d 546, 656 (D.N.J. 2010). Rather, it means that joinder would be "extremely

difficult or inconvenient." <u>Szczubelek v. Cendant Mortgage Corp.</u>, 215 F.R.D. 107, 116 (D.N.J. 2003) (citing <u>Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.</u>, 149 F.R.D. 65, 73 (D.N.J. 1993)). While no minimum number is required, the Third Circuit has stated that numerosity is generally met where the moving party "demonstrates that the potential number of plaintiffs exceeds 40 . . . ." <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., <u>Moore's Federal Practice</u> § 23.22[3][a] (3d ed. 1999)), <u>cert. denied</u>, 536 U.S. 958 (2002). The Court should also take into account other factors, such as the geographic dispersion of the anticipated class. <u>See</u> <u>Osgood v. Harrah's Entm't, Inc.</u>, 202 F.R.D. 115, 122 (D.N.J. 2001) (citing Herbert B. Newberg & Alba Conte, 1 <u>Newberg on Class Actions</u> (hereinafter <u>Newberg on Class Actions</u>) § 3.06, at 3-27 (3d ed. 1992)).

The numerosity requirement is satisfied in this case. The class approved by this Court contains over 1,200 putative class members, at least 526 of which have expressed interest in participating in this litigation. The members of the class are dispersed throughout four different states and the sheer number of potential plaintiffs would make joinder impracticable. <u>See</u> 1 Herbert B. Newberg & Alba Conte, <u>Newberg on Class Actions</u> § 3.05, at 3-25 (4th ed. 2002) (observing that classes "numbering in the hundreds" will alone satisfy numerosity); <u>see also</u> <u>NAACP v. N. Hudson Regional Fire & Rescue</u>, 255 F.R.D. 374, 382 (D.N.J. 2009), <u>remanded on other grounds</u>, 367 Fed. Appx. 297 (3d Cir. 2010) ("Even if all of the approximately 850 members of the proposed class here still live in Essex, Union or Southern Hudson County, joinder of over 800 additional plaintiffs would simply be impracticable.").

**b. Commonality**

Next, Plaintiffs must demonstrate that there are questions of fact or law that are common to the members of the class. Fed. R. Civ. P. 23(a)(2). Commonality exists where the named

plaintiffs share at least one question of fact or law with the grievances of the proposed class. See In re Warfarin, 391 F.3d at 527-28. Indeed, "Rule 23(a)(2) does not require that class members share every factual and legal predicate . . . ." In re Gen. Motors Corp., 55 F.3d at 817. Thus, the commonality requirement is easily met in most cases because all that is required is one common issue. Baby Neal, 43 F.3d at 56.

Plaintiffs clearly meet the low commonality threshold. All class members worked over forty hours and allege that they did not receive a proper amount of overtime pay for that time. Factually, Liberty's overtime formula is central to the claims of all class members. Legally, the class would implicate the substantive law of four different states. However, the claims all class members will turn on whether the FWW method of calculating overtime is compatible with applicable state wage and hour laws. In particular a common question across all four sub-classes would be whether Liberty's compensation regime qualifies as a FWW payment model. Courts regularly find commonality in similar wage and hour suits in which class certification is sought. See, e.g., Bernhard v. TD Bank, N.A., No. 08-4392, 2009 WL 3233541, at *3 (D.N.J. Oct. 5, 2009); In re Janney Montgomery Scott LLC Fin. Consultant Litig., No. 06-3202, 2009 WL 2137224, at *4 (E.D. Pa. July 16, 2009); Lenahan v. Sears Roebuck and Co., No. 02-0045, 2006 WL 2085282, at *7 (D.N.J. July 24, 2006).

### c. Typicality

The claims of the representatives must also be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). The Third Circuit recently identified three interrelated considerations relevant to this inquiry: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable

11

to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 599 (3d Cir. 2009). This component of Rule 23 is designed to ensure that "the [class representatives] will work to benefit the entire class through the pursuit of their own goals." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions (Prudential II), 148 F.3d 283, 311 (3d Cir. 1998) (citing Baby Neal, 43 F.3d at 57), cert. denied, 525 U.S. 1114 (1999).

The typicality prong does not require that all putative class members share identical claims or underlying facts. See Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998), cert. denied 526 U.S. 1114 (1999). All that is required is a strong similarity in legal theories or a showing that the claims arise from the same course of conduct. See Prudential II, 148 F.3d at 311-12; Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123 (3d Cir. 1987) (citing 1 Newberg on Class Actions § 3.15, at 168 (2d ed. 1985)), abrogated in part on other grounds by Reed v. United Transp. Union, 488 U.S. 319 (1989).

All class members allege that they were improperly compensated as a result of Liberty's overtime compensation formula. The injury sustained by the class representatives is the same as the injury sustained by the class as a whole. They seek same relief as all putative class members. Because the class representatives challenge the same underlying conduct as do all members in the putative class, the interests of the class representatives are completely aligned with the interests of the entire class. See Newton, 259 F.3d at 183-84 ("If the claims of the named plaintiffs and putative class members involve the same conduct by defendant, typicality is established regardless of factual differences."). Moreover, the named Plaintiffs are subject to the same overarching FWW defense as are all class members. The claims of the class representatives

are therefore typical of the absentees.

### d. Adequacy of Representation

Adequate representation focuses on two criteria: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." Wetzel, 508 F.2d at 247. These distinct inquiries assess the adequacy of class counsel and the adequacy named plaintiffs, respectively, to represent the rest of the class. See Prudential II, 148 F.3d at 312; Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir. 1996), aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). Plaintiffs clearly meet both of these prongs.

First, class counsel is comprised of competent and experienced class action attorneys that are readily capable of prosecuting Plaintiffs' claims. Class counsel is highly experienced in wage-and-hour litigation (March 4, 2011, Sweeney Decl. ¶¶ 58, 63). In fact, they are involved in nineteen (19) pending federal and state wage-and-hour cases (Id. ¶58). The Court observes that class counsel have competently and vigorously pursued the interests of the class throughout the litigation. For example, class counsel undertook a private investigation to identify potential class members, proposed a draft statement of stipulated facts to reduce costs, and efficiently reviewed a tremendous amount of electronic discovery to help evaluate the case.

Second, there are no conflicts between class representatives and other class members. The second prong serves to uncover conflicts of interest between the named parties and the class they seek to represent. See Amchem, 521 U.S. at 626 n.20 (citing Falcon, 457 U.S. at 157-58 n.13). Indeed, the absence of collusion or undue pressure assumes a "crucial" role in the context of settlement class certification. See In re Gen. Motors Corp., 55 F.3d at 799 n.21. Plaintiffs must prove the same wrongdoing as the absent class members in order to establish liability in this

matter. The named Plaintiffs held identical positions while employed by Liberty and allege the same harm as other Plaintiffs (March 4, 2011, Sweeney Decl. ¶57). Further, the settlement allocation formula poses no conflict because damages are calculated in the same way for the named Plaintiffs as for all other class members (Settlement Agmt. § II.S). See Lenahan, 2006 WL 2085282, at *8. Given the absence of any conflict, and the stellar qualifications of class counsel, the Court finds that the adequacy requirement is easily met.

In light of the foregoing, the class plainly satisfies each of the four prerequisites to class certification contained in Rule 23(a). The Court therefore now turns to Rule 23(b)(3).

### ii. Rule 23(b)(3) of the Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 23(b)(3) permits the court to certify a class in cases where "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These dual requirements are commonly referred to as "predominance" and "superiority," respectively. See, e.g., In re Constar Int'l, Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009).

### a. Predominance

Predominance probes whether the proposed class is sufficiently cohesive to warrant adjudication by representation. See Amchem, 521 U.S. at 623 (citing 7A Charles Alan Wright et al., Federal Practice & Procedure § 1777, at 518-19 (2d ed. 1986)). Although it tends to merge with the concept of commonality, it imposes a more exacting standard. See Newton, 259 F.3d at 186. To establish predominance, issues common to the class must predominate over individual issues. Prudential II, 148 F.3d at 313-14. Common issues do not "predominate," and the case in inappropriate for certification, if "proof of the essential elements of a cause of action require

individual treatment." <u>Newton</u>, 259 F.3d at 172 (citing <u>Binder v. Gillespie</u>, 184 F.3d 1059, 1063-66 (9th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1154 (2000)). Whether an element requires individual or common treatment depends nature of the evidence that will suffice to resolve it. <u>See</u> <u>In re Hydrogen Peroxide</u>, 552 F.3d at 311 (quoting <u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 566 (8th Cir. 2005)). When an issue requires both individual and common proofs, the Court must determine which proof is key to its outcome. <u>See</u> <u>In re Lineboard</u>, 305 F.3d at 162-163. Indeed, the presence of some individual issues "does not <u>per se</u> rule out a finding of predominance." <u>Prudential II</u>, 148 F.3d at 315.

Liberty's overtime formula was applied uniformly to all class members in these cases. Plaintiffs contend that it violated applicable state law and Liberty claims that it did not. Whether Liberty's formula was compatible with state wage and hour law is "about the most perfect question[] for class treatment." <u>Iglesias-Mendoza v. La Belle Farm, Inc.</u>, 239 F.R.D. 363, 373 (S.D.N.Y. 2007). This issue is clearly susceptible to class-wide proof. Whether the formula itself violated the law is the central issue in these cases and would determine Liberty's liability. Factual differences between class members, such as their base salary and their amount of unpaid overtime, are incidental matters that only impact damages. The Third Circuit has cautioned that "obstacles in calculating damages may not preclude class certification." <u>Newton</u>, 259 F.3d at 189. Where, as here, "common issues which determine liability predominate," calculating damages on an individual basis does not prevent an otherwise valid certification. <u>Bogosian v. Gulf Oil Corp.</u>, 561 F.2d 434, 456 (3d Cir. 1977) (citations omitted); <u>see also</u> <u>In re Community Bank of N. Va.</u>, 418 F.3d 277, 306-07 (3d Cir. 2005); <u>In re Lineboard</u>, 305 F.3d at 163.

Differences in the substantive state laws at issue will similarly pose no obstacle. Normally, a court must determine whether variances in applicable state law may be so

substantial as to defeat predominance. See In re LifeUSA Holding Inc., 242 F.3d 136, 147 (3d Cir. 2001); Prudential II, 148 F.3d at 315; Georgine, 83 F.3d at 627; In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986). However, variations in state laws are "irrelevant" when a case will come to fruition with the certification of a settlement class. See In re Warfarin, 391 F.3d at 529 (citing Amchem, 521 U.S. at 620). Thus, issues common to the class predominate over individual issues.

### b. Superiority

The non-exhaustive list of factors that a court may consider in evaluating the superiority of a class action include:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). This prong of Rule 23(b)(3) asks the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Georgine, 83 F.3d at 632 (quoting Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir.) (en banc), cert. denied, 419 U.S. 885 (1974)).

A class action in New Jersey is the "superior" method of adjudicating this controversy. First, the relatively modest size of each individual claim counsels that independent actions would likely be impracticable. See Georgine, 83 F.3d at 633 (citing Fed. R. Civ. P. 23(b)(3) advisory note to 1966 amendment). The class action procedure would serve to spread the costs of litigation across a greater pool of injured parties, In re Gen. Motors, 55 F.3d at 783-84, and the total amount of potential liability is not so significant as to impose "hydraulic pressure" on

Liberty to settle in the face of marginal claims. See Newton, 259 F.3d at 167 n.8 (citing In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293 (7th Cir.), cert. denied, 516 U.S. 867 (1995)). Any potential interest in maintaining individual actions is further diminished by the fact that there are no other pending lawsuits arising from the same allegations beyond those involved in the settlement. See In re Warfarin, 391 F.3d at 534 (citing Prudential II, 138 F.3d at 316). Second, New Jersey is also the most appropriate forum for the class. A forum selection clause found in the employment contract of each class member limits the disposition of their claim to the jurisdiction of New Jersey (Employment Agmt. ¶¶ 3.1). Concentrating litigation in New Jersey is also desirable because it is home to Liberty's corporate headquarters. See In re Warfarin, 391 F.3d 534 (citing Prudential II, 138 F.3d at 316). Finally, the class consists of a fully-matured set of claims; the class itself closed at the point in time when Liberty stopped using the overtime formula at issue in this case. See Newton, 259 F.3d at 192. The class action mechanism is both fair and efficient in these cases.

Having determined that the class satisfies each of the requirements of Rule 23(a) and Rule 23(b)(3), final certification of the settlement class is warranted.

**B.  Final Approval of the Class Action Settlement**

Under Rule 23(e), the claims of a certified class may be settled only with the Court's approval. The Court acts in a protective capacity as fiduciary for absent class members by assuring that the settlement terms are "fair, reasonable, and adequate" in exchange for the release of the class claims. Fed. R. Civ. P. 23(e)(2); see In re Gen. Motors Corp., 55 F.3d at 805. The Court must "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." In re Gen. Motors Corp., 55 F.3d at 785 (quoting 2 Newberg on Class Actions §

17

11.41, at 11-88 (3d ed. 1992)). Where settlement negotiations precede class certification, and settlement and class certification are sought simultaneously, the Court must be "even more scrupulous" than usual to safeguard against abuses. Id. at 805. This "heightened standard" is intended to ensure that the class counsel has engaged in sustained advocacy throughout the proceedings and protected the interests of all putative class members. See Prudential II, 148 F.3d at 317. The fairness determination is ultimately committed to the sound discretion of the Court. Bryan v. Pittsburg Plate Glass Co., 494 F.2d 799, 801 (3d Cir.).

For the reasons that follow, the settlement is entitled to a presumption of fairness and is fair, reasonable, and adequate for purposes of Rule 23(e).

### i.  Presumption of Fairness

A class settlement is entitled to an "initial presumption of fairness" when "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Gen. Motors, 55 F.3d at 785 (citing 2 Newberg on Class Actions § 11.41 at 11-88 (3d ed. 1992)); Manual for Complex Litigation (Third) § 30.42, at 238 (1997). This presumption may attach even where, as here, settlement negotiations precede class certification. See In re Warfarin, 391 F.3d at 535.

The settlement here clearly satisfies these criteria. The class settlement was the product of nearly six months of negotiations between highly experienced counsel, and after years of discovery, investigation, legal analysis, and motion practice. In addition, not one class member objected to the terms of the settlement agreement and only six affirmatively opted-out. This alone should be enough for the presumption of fairness to attach. See McCoy v. Health Net, Inc., 569 F. Supp. 2d 448, 458-59 (D.N.J. 2008); Varacallo v. Ma. Mut. Life Ins. Co., 226 F.R.D. 207,

235 (D.N.J. 2005). In addition, the Court directly oversaw the negotiations during which the settlement was reached. Participation of an independent mediator in settlement negotiations "virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." Bert v. AK Steel Corp., No. 02-467, 2008 WL 4693747 (S.D. Ohio Oct. 23, 2008) (internal citations omitted); see also Milliron v. T-Mobile USA, Inc., No. 08-4149, 2009 WL 3345762, at *5 (D.N.J. Sept. 14, 2009) (finding presumption applies when negotiations occurred before federal judge); In re LG / Zenith Rear Projection Tel. Class Action Litig., No. 06-5609, 2009 WL 455513, at *6 (D.N.J. Feb. 18, 2009) (same).

### ii.  Fairness of the Class Settlement

In Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), the Third Circuit identified nine factors that a court should consider in evaluating whether a proposed class action settlement is "fair, reasonable, and adequate." The nine Girsh factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) stage of the proceedings and the amount of discovery completed; (4) risks of establishing liability; (5) risks of establishing damages; (6) risks of maintaining the class action through the trial; (7) ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Id. at 516-17 (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)). However, due to the "sea-change" in the way class actions have evolved since Girsh was decided, the Third Circuit has instructed courts to address other concerns as they may arise in each case:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and

subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Prudential II, 148 F.3d at 324. These set of considerations embody a substantive inquiry into the terms of the settlement itself and a procedural inquiry into the negotiation process. In re Prudential Ins. Co. of Am. Sales Practice Litig. (Prudential I), 962 F. Supp. 450 (D.N.J. 1997) (citing In re Gen. Motors, 55 F.3d 796).

### a.  Complexity, Expense, and Duration of Litigation

This factor is intended to "capture 'the probable cost, in both time and money, of continued litigation.'" In re Gen. Motors, 55 F.3d at 812 (quoting Bryan, 494 F.2d at 801). Where the complexity, expense, and duration of litigation are significant, the Court will view this factor as favoring settlement. Prudential I, 962 F. Supp. at 536.

If this action were to continue, the parties would expend considerable time and money pursuing their claims. For start, these cases involve claims that arise under several state and federal statutes. While the differences in substantive law are not unmanageable, supra, it would undoubtedly make the process of litigation complex. See In re Gen. Motors, 55 F.3d at 812 (finding complexity arising from a "web of state and federal warranty, tort, and consumer protection claims"). The previously-litigated action against Liberty Travel in Pennsylvania spanned over thirteen (13) years and was extremely adversarial. Here, the parties would be forced to confront fairly technical legal issues regarding the FWW overtime model to prevail on the merits. Continued prosecution of this case both before and at trial would therefore require extensive involvement by experts. Heavy dispositive motion practice would be a certainty. The expected factual and legal issues at trial are complex. Based on the history of the Pennsylvania

action, an appeal would likely follow. By reaching a settlement prior to the time for dispositive motions, the parties "avoid[] the costs and risks of a lengthy and complex trial." Ehrheart v. Verizon Wireless, 609 F.3d 590, 595 (3d Cir. 2010). Since continued litigation would be time-consuming and expensive, settlement makes consummate sense.

### b. Reaction of the Class to Settlement

The second factor seeks to gauge whether members of the class actually support the settlement. Prudential II, 148 F.3d at 318. Courts generally assume that silence constitutes "tacit consent" to the settlement terms. Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1314 n.15 (3d Cir. 1993) (citing Shlensky v. Dorsey, 574 F.2d 131, 148 (3d Cir. 1978)). Thus, courts looks to the "number and vociferousness of the objectors." In re Gen. Motors, 55 F.3d at 812.

Here, not one single member from the class objected to the terms of the settlement, and less than one percent of the class opted out. While this type of response weighs in clear favor of the settlement, Weber v. Gov't Emp. Ins. Co., 262 F.R.D. 431, 445 (D.N.J. 2009); In re Cendant Corp., Derivative Action Litig., 232 F. Supp. 2d 327, 333-34 (D.N.J. 2002), the Third Circuit has cautioned that the inference of silent approval may be unwarranted in cases where the settlement and class action notice are sent in tandem. This is because class members are not in a position to weigh the relative strengths and weaknesses of the settlement terms. See In re Gen. Motors, 55 F.3d at 812-13. While mindful of this admonition, the inference of approval is still warranted in this case. Unlike General Motors, the notice that was mailed out to potential class members included a clear and informative summary about the claims in each of the underlying cases, placing potential class members in a better position to judge the terms of the settlement agreement. The class reaction strongly supports the settlement.

## c.  Stage of the Proceedings and Amount of Discovery Completed

This factor considers the degree of case development accomplished by counsel prior to settlement. See In re Gen. Motors, 55 F.3d at 813. For the proceedings to be sufficiently developed to foster a fair settlement, the parties must have "an adequate appreciation of the merits of the case before negotiating." Id. Courts therefore endeavor into "the type and amount of discovery the parties have undertaken." Prudential II, 148 F.3d at 319. In general, post-discovery settlements are more likely to be fair and reflective of the true value of the claims in the case. See Bolger, 2 F.3d at 1314.

The parties entered the settlement armed with much discovery. Over the course of one year, initial disclosures were exchanged, a tremendous volume of documents were produced, and the depositions of all named parties were taken. Plaintiffs' counsel also informally interviewed potential class members, and coordinated with defense counsel to draft a joint stipulation of facts. Numerous conferences addressing discovery and case management were conducted by the Court. The parties were also aided in substantial part by discovery already gained from prior litigation, which involved over twenty-nine (29) depositions, dispositive motions, and an appeal. The Third Circuit has explicitly recognized that discovery in a parallel proceeding can be beneficial to settlement negotiations. See In re Gen. Motors, 55 F.3d at 813 (citations omitted).

This case settled just sixty (60) days before the close of fact discovery. CM/ECF No. 89. Thus, both parties were in an excellent position to enter negotiations based on their unique knowledge of the underlying facts. See In re Cendant Corp. Litig., 264 F.3d at 236 (finding appreciation for merits despite settlement at an early stage of discovery). With extensive discovery and due diligence, class counsel clearly possessed sufficient information to assess the relative strengths and weaknesses of their case and reach a fair bargain. The stage of proceedings

22

factor thus weighs in favor of approving the settlement.

### d.  Risks of Establishing Liability and Damages

The fourth and fifth <u>Girsh</u> factors survey the "possible risks of litigation" by balancing the likelihood of success, and the potential damages award, against the immediate benefits offered by settlement. <u>Prudential II</u>, 148 F.3d at 319. Where the risks of litigation are high, these factors weigh in favor of the settlement. <u>See id.</u> Because damages are contingent on establishing liability, "the same concerns animate both of these elements." <u>McCoy</u>, 569 F. Supp. 2d at 461. To properly weigh these considerations, the Court should not press into the merits of the case and instead rely to a certain extent on the estimation provided by class counsel, who is experienced with the intricacies of the underlying case. <u>See</u> <u>Dewey v. Volkswagen of Am.</u>, 728 F. Supp.2d 546, 584 (D.N.J. 2010) (citing <u>In re Ikon Office Solutions, Inc. Sec. Litig.</u>, 209 F.R.D. 94, 105-06 (E.D. Pa. 2002)); <u>Weber</u>, 262 F.R.D. at 445 (quoting <u>Perry v. FleetBoston Fin. Corp.</u>, 229 F.R.D. 105, 115 (E.D. Pa. 2005)). The immediate cash payout provided by the class settlement offers a substantial benefit over the many risks and costs Plaintiffs would face in litigating their claims to a conclusion.

First, it is not clear that Plaintiffs could maintain their state claims for unpaid overtime alongside the federal causes of action under the FLSA. In <u>De Asencio v. Tyson Foods</u>, 342 F.3d 301, 309 (3d Cir. 2003), the Third Circuit directed courts to analyze, on a case-by-case basis, whether the joinder of state law overtime claims with a claim under the FLSA is a proper exercise of supplemental jurisdiction. Where state law issues "substantially predominate," the state claims may be dismissed without prejudice for resolution by state tribunals. <u>Id.</u> (quoting <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966)).

Second, even assuming the state law claims could remain, Plaintiffs' ability to succeed on

those claims depends on whether the FWW method of overtime pay provides a sufficient defense under state law. This determination would have to be made with respect to each state law involved. For those states that embrace the FWW approach to overtime pay, Plaintiffs would need to establish that Liberty's overtime formula was not a proper application of the FWW method.

Third, any issues that survived summary judgment would go to trial before a jury. A trial on the merits always entails considerable risk. Weiss v. Mercedes-Benz of N. Am., Inc., 899 F. Supp. 1297, 1301 (D.N.J. 1995). This is particularly true here, given the technical nature of the FWW method and the need to rely on expert testimony. See In re Cendant Corp., 264 F.3d at 239 (recognizing the increased risk of establishing liability when a jury is presented with competing expert testimony).

Finally, even if Plaintiffs were to succeed on the merits, the quantum of damages that they could collect is also uncertain. For example, under the FLSA a party may collect on three years of back pay, instead of the two year default, only if they can prove that the opposing party acted willfully. See, e.g., Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 273 (3d Cir. 2010); Brock v. Claridge Hotel and Casino, 846 F.3d 180, 188 (3d Cir.), cert. denied, 488 U.S. 925 (1988). Throughout, Defendants could be expected to continue their zealous defense and would likely appeal if plaintiffs prevailed. In the fact of such considerable risks, an immediate cash settlement provides certainty and offers a significant benefit to all class members.

### e.  Risks of Maintaining the Class Action Through Trial

The sixth Girsh factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." In re Warfarin, 391 F.3d at 538. This factor is important because the prospects for obtaining certification impact the range of recovery that a

party can reap from the action. <u>In re Gen. Motors</u>, 55 F.3d at 817.

The Court has found that class certification is appropriate for purposes of settlement, and suspects the result would be the same for a litigation class. However, Liberty would strenuously contest certification if the case were to proceed (March 4, 2011, Sweeney Decl. ¶¶ 70, 72). Confronted with a motion to certify a litigation class, instead of a settlement class, the Court would additionally need to consider whether the case would pose intractable management problems. <u>See</u> <u>Amchem</u>, 521 U.S. at 620. It is also possible that Liberty would seek an interlocutory appeal of any order granting class certification. <u>See</u> Fed. R. Civ. P. 23(f). In addition, class certification can always be modified at any time before final judgment. Fed. R. Civ. P. 23(c)(1)(C). All in all, the risk of decertification is small. However, this is not an obstacle to approval. The Third Circuit cast some doubt on how "significant" this factor is in cases where a settlement class is sought, <u>Prudential II</u>, 148 F.3d at 321, and some courts in this district have discredited the importance of this factor in settlement-only classes, <u>e.g.</u>, <u>In re Schering-Plough/Merck Merger Litig.</u>, No. 09-1099, 2010 WL 1257722, at *11 (D.N.J. March 26, 2010).

### f.  Ability of Defendant to Withstand a Greater Judgment

This factor "is concerned with the whether the defendants could withstand a judgment for an amount significantly greater than the settlement." <u>In re Cendant Corp.</u>, 264 F.3d at 240. The Court is not in a position to determine whether Liberty could withstand a greater judgment than the substantive settlement. However, a settlement amount greater than the payouts provided under the settlement would likely be difficult to attain given that they are largely based on figures from payroll records. This factor therefore does not favor or disfavor settlement. <u>See</u> <u>In re Warfarin</u>, 391 F.3d at 538 ("[T]he fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the ... class members are entitled to under the

theories of liability that existed at the time the settlement was reached."). Indeed, courts in this district regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts. See, e.g., McCoy, 569 F. Supp.2d at 462-63; Weber, 262 F.R.D. at 446; Varacallo, 226 F.R.D. at 239.

### g. Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation

The final two Girsh factors collectively "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." In re Warfarin, 391 F.3d at 538. To make this determination, the Court analyzes the reasonableness of the settlement against the best possible recovery and the risks the parties would face if the case went to trial. Prudential II, 148 F.3d at 322. In cases where monetary relief is sought, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." In re Gen. Motors, 55 F.3d at 806 (quoting Manual for Complex Litigation (Second) § 30.44, at 252 (1985)). Precise value determinations, however, are not necessary. In re Pet Food Prods. Liability Litig., 629 F.3d 333, 355 (3d Cir. 2010) (citing In re Warfarin, 391 F.3d at 538).

These factors likewise weigh in favor of approving the settlement. The settlement establishes a fund of $3 million to compensate class members for unpaid overtime. Each state law class member will receive a payout dependent on the number of overtime hours that they worked. The total amount each class member receives should put them in roughly the same position as if they received one and a half times their hourly rate for each overtime hour worked. In other words, the settlement payout basically restores each class member to where they would have been had Liberty paid overtime at one and one half times each employee's regular rate. Compensating the class members at close to one hundred percent (100%) of their alleged actual

damage "obviously represents a good value for the class members' claims, and is well within the range of reasonableness." Weber, 262 F.R.D. at 447.

Plaintiffs acknowledge that recovery "could be greater" if they prevailed on all claims at trial. Plaintiffs do seek liquidated damages under some of the state law claims involved. But winning on any claim is far from certain and hitting a grand slam would be unlikely. Plaintiffs would face considerable risk were the case to proceed. Defendants have certain credible defenses and strongly presented them. The settlement, on the other hand, offers an immediate and substantial benefit given the significant risks of litigation. See Varacallo, 226 F.R.D. at 240. In short, the recovery of each class member under the settlement "exceeds the value of the best possible recovery discounted by the risks of litigation." Prudential I, 962 F. Supp. at 540.

### h. Additional Factors

Several additional factors identified by the Third Circuit in Prudential, 148 F.3d at 323, also counsel in favor of approving the settlement. The underlying substantive issues are fully matured for adjudication given that Liberty ceased using the disputed method of overtime pay in August of 2008, which is when the state classes close. In addition, the parties were guided by extensive discovery that was obtained in the prior Liberty litigation. See McCoy, 569 F. Supp. 2d at 469. Class counsel are highly qualified and experienced in wage and hour class action litigation and consider the terms of the settlement to be fair, reasonable, and adequate. See Varacallo, 226 F.R.D. at 240 (citing Prudential I, 962 F. Supp. at 543). Finally, the settlement was premised on Liberty payroll records. See McCoy, 569 F. Supp. 2d at 469.

After careful consideration of the Girsh factors, and the presumption of fairness, the Court concludes that the substantive terms of the settlement are eminently fair and that the negotiation process was unassailable. The majority of the Girsh factors, and several additional

considerations, strongly favor approval. The settlement provides a significant benefit to all class members, which is substantiated by the overwhelmingly positive response from the class. Accordingly, the Court approves the terms of the settlement that resolve the state law class claims.

### C.  Approval of the Collective Action Settlement

Plaintiffs also ask the Court to approve the balance of the settlement agreement that resolves the collective action claims under the FLSA. Previously, the Court conditionally certified an FLSA class. See CM/ECF No. 41. Courts in this district, however, use a two-stage procedure to certify classes under the FLSA. See, e.g., White, 743 F. Supp. 2d at 383; Morisky v. Pub. Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 497 (D.N.J. 2000).[4] The Court must therefore reach a final determination as to the FLSA class before addressing the terms of the settlement. See Burkholder v. City of Ft. Wayne, __ F. Supp.2d __, 2010 WL 4457310, at *2 (N.D. Ind. 2010) (collecting cases); Vasquez v. Coast Valley Roofing, Inc., 670 F. Supp. 2d 1114, 1124 (E.D. Cal. 2009) ("Subject to final approval at a later date, conditional certification of a settlement class under the FLSA is appropriate.").

### i.  Final Class Certification Under the FLSA

To certify a case as a collective action under the FLSA, the Court must determine that employees in the class are "similarly situated," within the meaning of § 16(b) of the Act. See Sperling v. Hoffman-La Roche, Inc., 862 F.2d 439, 444 (3d Cir. 1888), aff'd, 493 U.S. 165

---

[4]  The two stages consist of a preliminary or "conditional" certification and then, after notice issues and pertinent discovery is obtained, a "reconsideration" phase during which the Court will either grant final certification or decertify the class. See Ruehl v. Viacom, Inc., 500 F.3d 375, 388 n.17 (3d Cir. 2007) (recognizing use of two-tier certification process in ADEA collective action that incorporates section 16(b) of the FLSA). See generally 7B Charles Alan Wright et al., Federal Practice & Procedure § 1805, at 487 (3d ed. 2005) (hereinafter Federal Practice & Procedure).

(1989); Morisky, 111 F. Supp. 2d at 496. Courts impose a stricter standard for final class certification than they do for conditional certification because the factual record is more fully developed. See Morisky, 111 F. Supp. 2d at 497 (citing Thiessen v. Gen. Elec. Capital Corp., 996 F. Supp. 1071, 1080 (D. Kan. 1998)); 7B Federal Practice & Procedure § 1805, at 497. In Lockhart v. Westinghouse Credit Corp., 879 F.2d 43 (3d Cir. 1989), the Third Circuit tacitly endorsed the factors identified in Plummer v. General Electric Co., 93 F.R.D. 311 (E.D. Pa. 1981), and Lusardi v. Xerox Corp. (Lusardi I), 118 F.R.D. 351 (D.N.J. 1987) to make this determination. It explicitly approved a "balancing" of these factors in a later decision. See Ruehl, 500 F.3d at 388 n.17 ("[W]e have approved of the balancing of factors in Plummer and Lusardi." (citing Lockhart, 879 F.2d at 51)). Courts in this district regularly use the Lusardi factors to reach a final determination on class certification under the FLSA. See, e.g., Aquilino v. Home Depot, U.S.A., Inc., No. 04-4100, 2011 WL 564039, at *5 (D.N.J. Feb. 15, 2011); Zavala v. Wal-Mart Stores, Inc., No. 03-5309, 2010 WL 2652510, at *2 (D.N.J. June 25, 2010). They include "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [defendants] which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." Lusardi I, 118 F.R.D. at 359, vacated in part sub nom. Lusardi v. Lechner (Lusardi II), 855 F.2d 1062 (3d Cir. 1988). This list is neither exhaustive nor mandatory to grant certification. Ruehl, 500 F.3d at 388 n.17.

There is no doubt that the FLSA class should be certified. Because the analysis required for final certification, "largely overlap[s] with class certification analysis under Federal Rule of Civil Procedure 23(a)," the Court need only address the Lusardi factors in passing. Murillo v. Pac. Gas & Elec. Co., No. 08-1974, 2010 WL 2889728, at * 3 (E.D. Cal. July 21, 2010); see also Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1105 (10th Cir. 2001) (noting "there is little

difference [between the two] approaches"). The factual circumstances underlying the claims of each putative class members are very similar, not disparate. Each held the same job, signed the same employment contract, worked overtime during the relevant class period, received overtime pay pursuant to a common formula, and each claims the same relief under the FLSA. The class as a whole is therefore "similarly situated" to the class representatives. Second, the Court cannot envision any individualized defenses that would interfere with final certification. In any case, the concern with individualized defenses is that they may pose case management problems. See Ruehl, 500 F.3d at 388. However, the Court need not account for case management issues because, much like the Rule 23 analysis, the class is being certified for purposes of settlement. See Amchem, 521 U.S. at 620.

### ii.  Fairness of the Collective Action Settlement

Unlike a traditional class action under Rule 23, potential class members in an FLSA collective action must affirmatively opt-in to be bound by the judgment. See Lusardi II, 855 F.2d at 1070. Their failure to do so does not prevent them from bringing their own suit at a later date. Id. (citing Pentland v. Dravo Corp., 152 F.2d 851, 853 (1945)). This differs markedly from a class action instituted under Rule 23(b)(3). See 5 Newberg on Class Actions § 16.20 (noting tension between res judicata effect of FLSA collective action and Rule 23(b)(3) class action). Thus, the Court does not assume the same "fiduciary" role to protect absent class members as it would under Rule 23 when assessing a proposed settlement resolving FLSA claims.

To approve a settlement resolving claims under the FLSA, the Court must scrutinize its terms for fairness and determine that it resolves a bona fide dispute. See Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1354 (11th Cir. 1982); see also H.R. Rep. No. 101-664, at 18-19 (1990). In so doing, the Court ensures that the parties are not "negotiating around the clear FLSA

requirements" via settlement. Collins v. Sanderson Farms, Inc., 568 F. Supp. 2d 714, 720 (E.D. La. 2008). Its obligation "is not to act as caretaker but as gatekeeper." Goudie v. Cable Commc'n, Inc., No. 08-507, 2009 WL 88336, at *1 (D. Or. Jan.12, 2009). As set forth above, the Court has detailed the reasons the settlement is fair.

The "bona fide dispute" requirement is not an issue here. The dispute between the parties centers on whether the overtime formula used by Liberty was compatible with the FLSA. Liberty argues that its formula provided proper overtime wages under the FWW approach to compensation. Plaintiffs on the other hand contend that they were entitled to more. A disagreements over "hours worked or compensation due" clearly establishes a bona fide dispute. Hohnke v. United States, 69 Fed. Cl. 170, 175 (Fed. Cl. 2005). The institution of a federal court litigation followed aggressive prosecution and strenuous defense demonstrates the palpable bona fides of this dispute. See Lynn's Food, 679 F.2d at 1354; see also D.A. Schulte, Inc. v. Gangi, 328 U.S. 108, 113 n.8 (1946). The settlement, which provides time and one half each employee's hourly rate, represents "a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching." Lynn's Food, 679 F.2d at 1354. Accordingly, the Court approves the portion of the settlement resolving the FLSA claims.

### D.  Attorneys' Fees and Expenses

Class counsel also seeks an award of attorneys' fees and reimbursement of expenses in the amount of $990,000. This is a common fund case in which fees and costs come directly out of the recovery to the class. See generally In re Cendant Corp. Litig., 264 F.3d at 256. More specifically, class counsel seeks $978,353.16 in fees and $11,646.84 in out-of-pocket expenses. These amounts represent 32.61% and .39%, respectively, of the common fund. The Court notes preliminarily that it has received not a single objection pertaining to the proposed amount of fees.

See Lenahan, 2006 WL 2085282, at *19 ("The lack of significant objections from the Class supports the reasonableness of the fee request.").

Courts in the Third Circuit employ the percentage-of-recovery method to award attorneys' fees in common fund cases. See In re Gen. Motors, 55 F.3d at 821 (citing Court Awarded Attorney Fees, 108 F.R.D. 237, 255 (1985) (hereinafter Task Force Report)); see also Manual for Complex Litigation (Fourth) § 14.121, at 186 (2004). Indeed, it is the prevailing methodology used by courts in this Circuit for wage-and-hour cases. See, e.g., In re Janney, 2009 WL 2137224, at *14; Chemi v. Champion Mortg., No. 05-1238, 2009 WL 1470429, at *10 (D.N.J. May 26, 2009); Lenahan, 2006 WL 2085282, at *19. Under the percentage-of-recovery approach, the Court must determine whether the percentage of total recovery that the proposed award would allocate to attorneys fees is appropriate "based on the circumstances of the case." In re Cendant Corp. Litig., 264 F.2d at 256. The Court is primarily guided by seven factors identified by the Third Circuit:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000) (citations omitted); see also In re AT&T Corp., 455 F.3d 160, 166 (3d Cir. 2006) (noting that courts should also consider any other factors that are "useful and relevant" under the facts of each case) (citations omitted). Each case is different, however, and in some circumstances one single factor may outweigh the rest. See In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 301 (3d Cir. 2005) (citing Gunter, 223 F.3d at 195 n.1). In addition to the Gunter factors, the Third Circuit has suggested that courts "cross-check" its fee calculation against the lodestar award method. Gunter, 223 F.3d at 195 n.1.

Based on the reasons that follow, the Court finds that the fees requested by Class Counsel are appropriate given the facts of this case.

### i.  Size of Fund and Number of Persons Benefitted

As a general rule, the appropriate percentage awarded to class counsel decreases as the size of the fund increases. See In re Cendant Corp. Prides Litig., 243 F.3d 722, 736 (3d Cir. 2002) (citing Task Force Report, 108 F.R.D. at 256). The inverse relationship is predicated on the belief that increases in recovery are usually a result of the size of the class and not a result of the efforts of counsel. See Prudential II, 148 F.3d at 339 (quoting In re First Fidelity Bancorp. Sec. Litig., 750 F. Supp. 160, 164 n.1 (D.N.J. 1990)). The settlement achieved in this case, while substantial, does not create a "mega-fund." See In re Cendant Corp. Prides Litig., 243 F.3d at 736-37. Moreover, the results obtained represent a significant benefit in the face of the many legal and factual risks posed by litigation. The common fund is substantial in that it creates a common fund of $3 million for over one thousand class members. Smaller common funds have been found significant for classes of roughly the same size in other wage-and-hour cases. See, e.g., In re Janney, 2009 WL 2137224, at *14 ($2.9 million for 1,310 class members); Chemi, 2009 WL 1470429, at *10 ($1.2 million for 917 class members). The benefit to each class member is all the more significant in that it approximates 100% of the actual damages that they would collect if they prevailed at trial. See Gunter, 223 F.3d at 199 n.5 (noting it may be prudent for courts to "to determine what percentage of the plaintiffs' and class members' approximated actual damages the settlement figure represents" in light of the risk of non-recovery). The settlement therefore creates a substantial benefit for a large group of class members.

### ii.  Presence or Absence of Substantial Objections

The Notice sent out to each class member expressly advised them that class counsel

would apply for an attorney fee award in the amount of 33% of the settlement fund. It also set out the procedure for objecting to the fee request. To date, the claims administrator has received no objections—either to the settlement terms generally or to the fee request specifically. The absence of any objection weighs in favor of the fee request. See In re Rite Aid, 396 F.3d at 305; In re Janney, 2009 WL 2137224, at *14; Chemi, 2009 WL 1470429, at *11.

### iii.  Skill and Efficiency of Class Counsel

The skill and efficiency of class counsel is "measured by 'the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 194 (E.D.Pa.2000) (quoting In re Computron Software, Inc., 6 F. Supp. 2d 313, 323 (D.N.J. 1998)). As noted earlier, class counsel is highly experienced in complex wage-and-hour class action litigation. Based on the Court's experience in supervising this litigation, class counsel has demonstrated the utmost skill and professionalism in effectively managing these consolidated actions and bringing them to a successful conclusion. Defendants counsel are also savvy, experienced defense attorneys in wage-and-hour cases (March 4, 2011 Sweeney Decl. ¶ 9), and the ability to achieve a favorable result in a case involving such formidable defense counsel is a clear indication of the skill with which class counsel handled these cases. See In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389, 407 (D.N.J. 2006). Class counsel's success in bringing this litigation to a conclusion prior to trial is another indication of the skill and efficiency of the attorneys involved. See Gunter, 223 F.3d at 198 (noting that the percentage method encourages early settlements by efficient counsel (citing Manual on Complex Litigation (Third) § 24.121, at 207 (1997))). This factor therefore weighs in

favor of the fee request.

### iv.  Hours Worked and Risk of Non-Payment

Courts consider the risk of non-payment in light of the Defendant's ability to satisfy an adverse judgment, Yong Soon Oh v. AT&T Corp., 225 F.R.D. 142, 152 (D.N.J. 2004), or the risk of establishing liability at trial, In re Cendant Corp., 232 F. Supp. 2d at 339. Although the Court has no reason to believe Defendant could not satisfy an adverse judgment, supra, class counsel faces a risk of non-payment due to the difficulty of establishing liability at trial. Class counsel has prosecuted this case on a contingent basis, with no retainer. As described above, the case poses a number of genuine factual and legal risks. Liberty presents a strong defense that, if successful, could relieve the company from any liability. In short, class counsel undertook substantial risk that the litigation would yield little or no recovery and leave them completely uncompensated for their time.

Class counsel has expended over 1,800 hours in bringing this case to a favorable resolution. As reflected in the Sweeney declaration, the hours recorded were incurred investigating claims, interviewing putative class members, reviewing documents produced by Liberty, taking and defending depositions, drafting and defending several formal motions, responding to two motions to dismiss, and engaging in extensive settlement negotiations. Given the complexity of the issues involved in this case and the activities performed to date, the hours incurred are entirely reasonable. The considerable amount of time devoted to this case, coupled with the risk of non-payment, also weighs in favor of the fee request.

### v.  Awards in Similar Cases

The requested fee is also consistent with awards in similar cases. To address this factor, the Court should (1) compare the actual award requested to awards in comparable settlements,

and (2) ensure that the award is consistent with what an attorney would have likely received if the fee was negotiated on the open market. Dewey, 728 F. Supp. 2d at 604. In common fund cases, fee awards generally range anywhere from nineteen percent (19%) to forty-five percent (45%) of the settlement fund. See In re Gen. Motors, 55 F.3d at 822 (citing In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533 (E.D. Pa. 1990)). The fee requested in this case, which represents 32.6% of the settlement fund, clearly falls within this range and is entirely consistent with fee awards for similar wage-and-hour cases in this Circuit and throughout the country. See, e.g., Lenahan, 2006 WL 2085282, at *19 (thirty percent (30%)); In re Janney, 2009 WL 2137224, at *16 (thirty percent (30%)); Adeva v. Intertek USA Inc., No. 09-1096, ECF Entry No. 228 (D.N.J. Dec. 22, 2010) (thirty-four percent (34%)); Bernhard, No. 08-4392, ECF Entry No. 40 (D.N.J. Feb. 3, 2010) (thirty-three percent (33%)); see also, e.g., Rotuna v. West Customer Mgmt. Group, LLC, No. 09-1608, 2010 WL 2490989, at *7-*8 (N.D. Ohio June 15, 2010) (thirty-three percent (33%)); Khait v. Whirlpool Corp., No. 06-6381, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20 2010) (thirty-three percent (33%)); Stefaniak v. HSBC Bank USA, N.A., No. 05-720, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008) (thirty-three percent (33%)); Gilliam v. Addicts Rehab. Ctr. Fund, No. 05-3452, 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008) (thirty-three percent (33%)). The percentage award in this case is also consistent with prevailing contingent fee rates in non-class action cases. See In re Lucent Tech., Sec. Litig., 327 F. Supp. 2d 426, 442 (D.N.J. 2006) (observing "the customary contingent fee would likely range between 30% and 40% of the recovery."); In re Ikon Office Solutions, 194 F.R.D. at 194 (same).

### vi.  Lodestar Cross-check

Finally, the requested fee is also supported by the Lodestar cross-check. The crosscheck is performed by calculating the "lodestar multiplier." In re AT&T Corp., 455 F.3d at 164. The

multiplier is determined by dividing the requested fee award, determined from the percentage-of-recovery method, by the lodestar. Id. This figure represents "the contingent nature or risk involved in a particular case and the quality of the attorneys' work." In re Rite Aid, 396 F.3d at 306 (citing Task Force Report, 108 F.R.D. at 243). The Third Circuit has recognized that multiples "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." Prudential II, 148 F.3d at 341 (citing 3 Newberg on Class Actions § 14.03, at 14-5 (3d ed.1992)). However, the Court may consider reducing the percentage-of-recovery award when the multiplier is too high. See In re Rite Aid, 396 F.3d at 306.

In determining the lodestar for cross-check purposes, the Court need not engage in a "full-blown lodestar inquiry," In re AT&T, 455 F.3d at 169 n.6 (citing In re Rite Aid Corp., 396 F.3d at 307 n.16), or "mathematical precision," In re Rite Aid Corp., 396 F.3d at 306-07 (citing Prudential II, 148 F.3d at 342). Indeed, where, there have been no objections to the lodestar calculations, "a full-blown lodestar analysis is an unnecessary and inefficient use of judicial resources." Dewey, 728 F. Supp. 2d at 592-93 (citing Weber, 262 F.R.D. at 451 n.10). Counsel submits that their fees as calculated under the lodestar method are $520,142.75. The fee request under the percentage of recovery method represents 1.88 times the lodestar. The Third Circuit has approved a cross-check multiplier of 3 in a "relatively simple" case that did not involve the application of several state laws or carry risks as to liability. See In re Cendant Corp. Prides Litig., 243 F.3d at 742. The 1.88 multiplier in this case is therefore quite reasonable. It is a reflection of the risks assumed by class counsel in taking the case on a contingency basis and the level of skill they bring to this complex litigation. It was through their diligence that the parties were able to reach a favorable settlement prior to dispositive motion practice. The Court therefore finds that the requested fee is also supported by the Lodestar method.

### vii.  Expenses

The Court likewise finds that class counsels' request for reimbursement of $11,646.84 in actual out-of-pocket litigation expenses is appropriate given that such expenses have been adequately documented and are reasonable based on the circumstances of this case. See generally In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001) ("Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1225 (3d Cir. 1995))).

### E.  Service Payments to Named Plaintiffs

Class counsel also seeks incentive awards from the common fund in the amount of $10,000 for each named Plaintiff, totaling $80,000. Service payments are fairly common in class action lawsuits involving a common fund for distribution to the class. See Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 1990) (quoting In re S. Ohio Correctional Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997)). The purpose of these payments is to compensate named plaintiffs for "the services they provided and the risks they incurred during the course of class action litigation," id., and to "reward the public service" of contributing to the enforcement of mandatory laws, see In re Cendant, 232 F. Supp. 2d at 344 (citing In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 535 (E.D. Pa. 1990)); see also Rodriguez v. West Publ'g Corp., 563 F.3d 948, 958-59 (9th Cir. 2009) (describing utility of incentive awards). An incentive award that comes out of the payment allocated for attorneys fees need not be subject to intense scrutiny because the interests of the public and the defendants are not directly affected. See In re Cendant, 232 F. Supp. 2d at 344 (citing In re Presidential Life Sec., 857 F. Supp. 331, 337 (S.D.N.Y. 1994)). Where the payments come out of the common fund independent of

attorneys' fees, the Court must "carefully review" the request for fairness to other class members. See Varacallo, 226 F.R.D. at 257.

Courts have ample authority to award incentive or "service" payments to particular class members where the individual provided a benefit to the class or incurred risks during the course of litigation. See, e.g., In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d at 412 ( (citations omitted)); Varacallo, 226 F.R.D. at 258; In re Cendant Corp., 232 F. Supp. 2d at 327 (citing Brotherton v. Cleveland, 114 F. Supp. 2d 907, 913 (S.D. Ohio 1991)); see also Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) (identifying factors relevant to awarding incentive payments (citing Spicer v. Chicago Bd. Options Exchange, Inc., 844 F. Supp. 1226, 1267 (N.D. Ill. 1993)).

Each of the named Plaintiffs devoted considerable time and effort into the prosecution of these cases. They provided detailed information on the job duties, contacted witnesses, set up meetings between class counsel and putative class members, executed declaration that were publicly filed with the Court, produced personal documents, and relayed information to class members during the pendency of the litigation (Decl. of Michael J. Sweeney in Supp. of Pls.' Mot. for Service Payments ("Sweeney Decl. for Service Payments") ¶ 2 [CM/ECF No. 104]). Several prepared and sat for depositions (Id. ¶ 3). All prepared with class counsel for settlement negotiations, and several attended the mediation sessions in person (Id. ¶¶ 5, 8). None of the other class members engaged in similar activity. In fact, class counsel indicates that these cases would not have been possible without the initial groundwork performed by the lead Plaintiffs (Id. ¶ 10). The benefits that accrue to all class members under the settlement agreement are therefore a direct result of the services rendered by named Plaintiffs. See Cullen, 197 F.R.D. at 146 ("[T]he assistance of the plaintiffs provided the foundation upon which this case was built."). In

bringing these actions, named Plaintiffs also took on certain risks. By bringing suit against a major company in the travel business, they risk their good will and job security in the industry for the benefit of the class as a whole. See Frank v. Eastman Kodak, Co., 228 F.R.D. 174, 187 (W.D.N.Y. 2005) ("In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." (citing Roberts v. Texaco, Inc., 979 F. Supp. 185, 201 (S.D.N.Y. 1997))).

In addition, the service payments sought are consistent, if not lower, than awards regularly provided in similar cases. See, e.g., Dewey, 728 F. Supp.2d at 610 ($10,000); In re Am. Inv. Life Ins. Co. Annuity Mktg. & Sales Practice Litig., 263 F.R.D. 226, 245 (E.D. Pa. 2009) (between $5,000 and $10,000); Mehling v. N.Y. Life Ins. Co., 248 F.R.D. 445, 467 (E.D. Pa. 2008); In re Elec. Carbon, 447 F. Supp. 2d at 412 ($12,000); Varacallo, 226 F.R.D. at 259 ($3,000 to $10,000 for active plaintiffs); In re Remeron End-Payor Antitrust Litig., No. 02-2007, 2005 WL 2230314, at *32-*33 (D.N.J. Sept. 13, 2005) ($30,000); see also 4 Newberg on Class Actions § 11.38, at 11-80 (citing empirical study from 2006 that found average award per class representative to be $16,000).

While the Court might normally compare the size of the service payment total to the size of the common fund in order to assess the impact of the award on other class members, it is unnecessary to do so in this case. Unlike other cases, the settlement is distributed on a claim-by-claim basis. Under the terms of the settlement, any unused funds revert to Liberty (Settlement Agmt. § III.B.1.g). With only 41.5% of the class participating, any decrease in the service payments would revert back to Liberty rather than be distributed to the class. Moreover, not one class member has filed an objection to the service enhancements despite a clear message in the

claims notice that counsel would apply for "service payments" in the amount of $10,000 for each named Plaintiff (Settlement Notice 3). Accordingly, the Court awards service payments to each of the eight (8) named Plaintiffs in the amount of $10,000 each.

### III.  Conclusion

Based on the reasons set forth above, the Court: (a) certifies the state class for purposes of this settlement; (b) certifies the FLSA class for purposes of this settlement; (c) approves the proposed settlement agreement in its entirety; (d) awards class counsel the attorneys' fees and costs requested; and (e) awards the service payments requested. A separate Order accompanies this Opinion.


 /s/ Mark Falk_____
**MARK FALK**
**United States Magistrate Judge**


Dated: April 8, 2011